### SUPERIOR OIL CO. v. HARSH et al.
#### Civ. No. 141–D.

District Court, E. D. Illinois.

July 1, 1941.

W. B. Wagner and J. P. Adoue, both of Houston, Tex., and Charles Wham and John P. Wham, both of Centralia, Ill., for plaintiff.

Russell Wilson, of Centralia, Ill., and Acton, Acton, Baldwin & Bookwalter, of Danville, Ill., for defendants.

LINDLEY, District Judge.

Plaintiff sues to enjoin defendants from operating an oil well upon the schoolhouse site located in the southwest corner of a tract of 12.17 acres, which latter tract is part and parcel of a larger one of 149 acres upon which plaintiff has an oil and gas lease from the record holder of the title. Defendants include the three school trustees and Harsh, Minton, Jobe and Somers, all interested in a later oil and gas lease of the school site executed by the trustees. Plaintiff relies upon the record title in its grantor. Defendants insist that the trustees are vested with complete title to the school site, which includes approximately six-tenths of an acre, either by virtue of (1) a deed from the prior owner now lost or (2) a presumption of an ancient grant arising from the circumstances involved; or (3) adverse possession. Plaintiff replies that the possession relied upon has not been adverse or hostile in the degree required by the statutes of Illinois to establish title against the record title owner; that there is no evidence of a lost deed and nothing to justify a presumption of an ancient grant; that if the trustees ever procured any title, it was a limited one which did not include the oil and gas and that defendants, now drilling on the school site, are trespassers.

The specific tract of 12.17 acres upon which the school site is located originally belonged to Stephen Fitzgerald and then to his sons, Charles, Edward and John, then, subsequent to 1887, to Charles and Edward, until partition of the estate between them in 1892. About 1886 School District 5, now known as 95, was organized, the effective proceedings apparently being completed on April 5, 1886, by the Board of Trustees, of which Charles was then president. The Board at that time acted favorably upon the petition of John and others for formation of the District. Sometime in 1886 a small schoolhouse had been erected in the extreme corner of the tract at a cost of $377. Bills for construction were paid in August and September, 1886. After completion of the building, a water well was driven, and a coal shed and two outside toilets were erected near the schoolhouse. These buildings have ever since been kept in repair and used by the District in the maintenance of a country school. They have been used also for only

the additional and incidental purposes contemplated by the then controlling statute, Chap. 122, Cothrans 1881 Ill.Rev.Stats. Sec. 39, providing that the trustees "may grant the temporary use of school-houses, when not occupied by schools, for religious meetings and Sunday Schools and for literary societies and for such other meetings as the directors may deem proper."

Some time after erection of the buildings, fences were built on the north and east sides of the site,—apparently by the landowner, to restrain his live stock from entering upon the school yard, and the evidence does not disclose that the trustees took any part in their construction or maintenance. Many years ago they disappeared. However, it seems that brush has grown irregularly along and near the sides of the site and defendants, subsequent to commencement of the controversy between the parties, caused a survey to be made, fixing the boundary lines upon the uncertain and indefinite evidence of the growing shrubs and brush, placing monuments at the corners. A public road on the south and a private one on the west abut the site.

There is no deed of record to the trustees, indeed, no proof that a deed for the school site was ever executed. During the entire existence of the District, the site has not been excepted from the tract on the tax books, and the owners of the record title of the larger tract have paid the taxes assessed against all of it including that part occupied by the school. The taxes paid have included those for maintenance of this school, and, these under the statutes, have been collected by the treasurer for the trustees. There is no evidence of any controversy between the School District and the owners as to title to the school site until after the discovery of oil in this territory and the drilling of wells by plaintiff under its lease.

The records of the trustees disclose an attempt to organize the District in 1874 and its culmination in 1886, upon the petition of John Fitzgerald and others. At a meeting of the Board held April 5, 1886, at which Charles Fitzgerald, president, presided, the Board ordered that the petition be granted. On April 16, 1886 the Board found that the objectors had failed to perfect any appeal. On April 12, 1887, Charles Fitzgerald's term of office having expired, the treasurer was instructed by the Board to notify the owner of the land on which the school site was located "to make proper deed" to the Board and on April 7, 1890, the Trustees directed that the president of the Board "see an attorney" and learn what proceedings could be had "to secure title to the schoolhouse site" in District 5.

 There was no evidence of execution or delivery of a deed or of further action looking to procurement of a conveyance. Defendants offered the testimony of a former director of the District, to the effect that he had received from a predecessor certain records which he kept in his house; that amongst these was a paper marked "deed"; that he never examined it and did not know its contents and that later the records were destroyed by fire. There is no evidence that this paper was a deed; that it was ever executed, or that it included a conveyance of this or any other land. In this situation, the record is wholly insufficient to support a finding that any formal title by way of deed was ever conveyed to the trustees. As said in Shipley v. Shipley, 274 Ill. 506 at 513 to 515, 113 N.E. 906, parol testimony regarding a deed's existence and contents must be clear and convincing. Every principle of public policy demands that proof of its former existence, its loss and its contents must be conclusive before a court will be justified in recognizing title, depending upon parol testimony, to property which the law requires shall pass only by deed or will. The Illinois court announced that proof of the contents must be so clear and positive as to leave no reasonable doubt of the substance of the material parts of the paper, and commented that it is futile if there is no evidence as to whether the paper bore a seal. The evidence before the court was not clear as to the conditions and provisions of the deed or as to what land was included; consequently, the court held the evidence insufficient to establish a deed. So here, no presumption or inference arises from the fact that a paper bearing the word "deed" was at one time amongst certain records of the school directors, who in Illinois have no title to school property. Carter Oil Company v. Liggett, 371 Ill. 482, 21 N.E.2d 569.

Plaintiff's oil and gas lease from the record owner was dated December 22, 1938. Under it the plaintiff has drilled and completed sixteen producing oil wells so located as adequately to drain all land included in the tract upon which the school

site is located. On September 17, 1940, the trustees executed and delivered to Minton and Jobe a lease for the oil and gas in the school site. This lease was recorded March 4, 1941, after plaintiff had drilled and completed the first well upon the premises leased to it. Minton and Jobe have assigned to Harsh, with certain reservations. The consideration for the later lease was $10 in cash with the further agreement to pay $90 and deliver a royalty interest in the oil produced. The $90 was to be paid after the title in the trustees should be established. Obviously the latter recognized the dubious character of their title as they stipulated that the lessees assume the obligation "to clear the title" without expense to the District. Following this, on March 5, 1941, Harsh procured the survey heretofore mentioned and still later entered upon the school site and began to drill and has now completed a well approximately 22 feet west of the eastern boundary line of the site as shown on the survey, which, if continued in operation, will drain oil and gas from at least eight acres surrounding it, all under prior valid lease to plaintiff.

Correct disposition of this case depends upon whether the trustees have such title to the school site as vests in them title to oil and gas. In turn the solution of this question must depend largely upon the nature of the acquired title at its inception and whether that nature or quality has changed by virtue of facts and circumstances in the record. The statute controlling when this site was first occupied by the trustees and the schoolhouse built, is Chap. 122, Cothrans 1881 Ill.Rev.Stats. Sections 39, 41 and 48. It is provided in Section 41 of the Act that the school trustees may acquire real estate which "shall vest in said Board for the use of said township for school purposes." Provision is made in Section 48 for location of schoolhouse sites in each district and the act directs that the school authorities "shall have the right to take the same for the purpose of a school-house site either with or without the owner's consent." It is further provided as a later contingency that in case the compensation to be paid for the site taken can not for any reason be agreed upon by the parties, it shall be the duty of the District "to proceed to have such compensation determined in the manner which may be at the time provided by law for the exercise of the right of eminent domain."

It is obvious from the record that, in pursuance of this statute, the school trustees did take the school site, with or without the owner's consent. It is also clear that inasmuch as one of the Fitzgeralds was president of the Board and the District was organized upon petition of his brother, and such president continued in office during the period of the construction of the school, there could have been no objection from the owner of the land to the taking of the site. Consequently, under the statute, the taking amounted to procuration, by virtue of eminent domain, of the site for the purposes contemplated by the statute. This is similar to the method pursued by the Government in condemnation of land for public purposes. Immediately upon the taking, the question arose as to compensation to the owner. The owner was entitled to compensation. Obviously he may have received compensation or he may have waived any payment. The only reasonable inference to be drawn from the actions of the Fitzgeralds and the Board of Trustees of which one of them was president is that the owners permitted the trustees to take the property for school purposes as contemplated by the statute without compensation. Consequently the title in its inception was the title obtainable by eminent domain. The fact that it was not necessary to go to court to take the land but that the school authorities might act under the statute informally, if it thereafter paid compensation or if such payment was not demanded, does not alter the character of what passed at the time of the taking. The title of the school trustees was the statutory title granted by the legislature, title by acts of eminent domain, a taking with consent of the owner for the use of the inhabitants of the township for school purposes. It would not alter the legal situation if the taking was without Fitzgerald's consent. The statute gave the trustees the right to take with or without his consent. There is no evidence that the school trustees procured any other kind of title or that they ever made any claim to any other kind of title and, under the statute, they could by their acts obtain only such title as was necessary for the statutory purposes, that is, conduct of the school. They derive all authority from the statute and can exercise no power not expressed thereby. Stevenson v. School Directors, 87 Ill. 255, 257; Clark et al. v. School Directors, 78 Ill. 474, 476; School Directors, etc. v. Fogleman, 76 Ill. 189, 191;

Potter v. Board of School Trustees, 10 Ill.App. 343, 345. Their title was merely the right to use the property for school purposes; there is no justification for its extension by implication. In Miller v. Commissioners, 278 Ill. 400, at 406, 116 N.E. 178, 181, it is said: "The grant of power to take the land of an individual by the exercise of the right of eminent domain is strictly construed, and the extent of the estate which may be taken is no greater than is necessary for the public purpose to be served. Where the estate to be taken is not expressly defined, only such an estate will vest as is necessary to accomplish the purpose in view, and where an easement is sufficient for that purpose no greater estate can be taken."

In Tacoma Safety Deposit Co. v. City of Chicago, 247 Ill. 192, 93 N.E. 153, 155, 31 L.R.A.,N.S., 868, 20 Ann.Cas. 564, the court said: "The owner of real estate, subject only to a public or private easement, has the right to use his property for any purpose which he may deem proper, so long as the use to which it is put does not interfere with the proper enjoyment of the easement which is held by the public or by a private person therein. * * * before the city could acquire the fee to said real estate for street purposes it must appear there was a statute in force which, by its terms or by necessary implication, authorized the city to take said property in fee, for the purpose of widening said street. * * * 'The taking of property under the right of eminent domain is in derogation of individual right, and therefore the grant is to be strictly construed.' * * * In Elliott on Roads and Streets the doctrine is thus stated (section 225): 'Unless the purpose for which the taking of the land is authorized is in itself such as requires that a fee should be seized, or the statute plainly authorizes that such an estate may be seized, then no more than an easement can be appropriated. * * * Where the language of the statute will bear a construction which will leave the fee in the landowner, that construction will be preferred, rather than one which will w*est the fee from him.' * * * Judge Cooley, in his work on Constitutional Limitations (7th Ed., p. 808), said: 'As a general rule, the laws for the exercise of the right of eminent domain do not assume to go further than to appropriate the use, and the title in fee still remains in the original owner.' * * * Mr. Lewis, in his work on Eminent Domain (section 449), says:

'Upon the principle that statutes conferring compulsory powers are to be strictly construed, it follows that, where the estate taken is not defined, only such an estate or interest will vest as is necessary to accomplish the purpose in view, and where an easement is sufficient no greater estate can be taken. Thus, under authority to take land for a highway, railroad, or other like use, only an easement can be acquired, for no greater estate is necessary.' "

To the same effect is Illinois State Trust Co. v. St. Louis, Iron Mountain & Southern Railroad Co., 208 Ill. 419, 422, 70 N.E. 357.

 It follows that the title acquired by the trustees at the inception, being one acquired by eminent domain, a taking with the owner's consent, under a statute giving the right to use the property for school purposes, no title to anything other than that necessary to enjoyment of what was contemplated by the statute, namely, use for school purposes, was included, and that the trustees were without the right to lease the school site for oil and gas purposes.

 Nor can this title to an easement be augmented to a fee simple or a determinable fee or to include anything other than use for school purposes by virtue of possession by the school district. This possession was entirely consistent with a use for school purposes only and the District cannot enlarge the title to an easement it had acquired by eminent domain by the taking or make it over into a title for all purposes by now claiming that it has acquired title by adverse possession. Title must be shown to have arisen from possession hostile in its inception, visible, notorious, exclusive and acquired and retained under claim of title inconsistent with that of the true owner. The presumption of law is that the possession of real estate is subservient to the rights of the owner of the record title and where the possession has been consistent with h*s title, nothing but a clear, unequivocal and notorious disavowal of the title of the owner will render the possession, however long continued, adverse to him. Kaneville v. Meredith, 351 Ill. 620, 184 N.E. 883; Kirby v. Kirby, 236 Ill. 255, 86 N.E. 259. A party attempting to establish title by adverse possession claims in derogation of the rights of the real owner. He rests his claim, not upon a title in himself as the true owner, but upon holding adversely to the true owner for the period prescribed by the statute of limitations. Inasmuch as he claims a benefit from his own wrong, his acts are to be

472

construed strictly. White v. Harris, 206 Ill. 584, 69 N.E. 519. Here there was no hostility. As I have said, the possession was only that which was consistent with the statutory purpose, title obtained by consent of the owner by eminent domain. This statutory title can not be enlarged by continuous possession under it to a fee simple by adverse possession. The fact that the trustees allowed the owner to pay taxes on the site and accepted and used them is likewise consistent only with a claim of title to an easement. Martin v. Barbour, 140 U.S. 634, 11 S.Ct. 944, 35 L. Ed. 546.

There is basis for no presumption or inference of any ancient grant, other than that which arises from the facts themselves, namely, from the taking of the land with the consent of the owner and the waiving of any compensation by the latter. These facts do not justify indulgence of any presumption of any grant other than that consistent with the use for school purposes. Indeed, defendants themselves offered testimony of one Fitzgerald who testified that his father many years ago said that when the property ceased to be used for school purposes it would revert to the Fitzgeralds. The evidence was probably incompetent, but it was offered by defendants and its implications are consistent only with the conclusion reached, namely, that the school trustees took the land under the statute with the owner's consent by the statutory informal method of exercising eminent domain for the limited purposes contemplated by the statute. It follows that plaintiff is entitled to injunction as prayed.

The findings and conclusions announced shall be included in my formal findings and conclusions, by way of reference.

Draft of proper judgment may be submitted.